# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In Re: | Case no. 11-54164 |
| Patrick George, | Chapter 7 Proceeding |
| Debtor. | Hon. Walter Shapero |
| _____/ | |
| Selwan Kesto, | |
| Plaintiff | Adversary No. 11-06602 |
| v. | |
| Patrick George, | |
| Defendant | |
| _____/ | |

## TRIAL OPINION

This is an adversary proceeding seeking to declare specified debt(s) allegedly owed to Plaintiff non-dischargeable under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). Plaintiff is Selwan Kesto and Defendant is Patrick George, the debtor in the Chapter 7 bankruptcy underlying this proceeding. Plaintiff has the burden of proving both (1) the existence of a debt or debts; and (2) to the extent any debt(s) exist, whether any of them are non-dischargeable under the aforementioned Code provisions. One need not answer the second question to the extent that Plaintiff does not prove the existence of a debt or debts.

This matter as it has evolved and as the Court perceives it is essentially an attempt to utilize a Section 523 non-dischargeability adversary proceeding as a vehicle for obtaining an accounting of the debts and credits between the parties hereto and their various entities as a result of the end of their professional relationship. A proper accounting and winding up is much more

thorough and complicated and involves numerous debits, credits, and possible valuations, from the beginning to the end of the business relationship(s) involved. In this case, only a portion of those issues has been fleshed out, and then only in a somewhat imperfect and unconvincing manner. This case emanates from the souring of the business relationship between Plaintiff and Defendant—a relationship that did not appear to adhere to any standard or uniform business practices. Indeed, the arbitrator in a prior and related state court case noted such by describing the "almost comical lack of sound business practice." They kept poor records, when they bothered to keep any at all, and the structure and conduct of their business relationship was so convoluted as to make them difficult to decipher. That said, the Court must and will deal with the various claims actually made in the context and framework required in this non-dischargeability proceeding.

### (A) JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

### (B) FINDINGS OF FACT

**(1) Underlying General Facts**

Plaintiff and Defendant were members of the George and Kesto Companies, LLC (the "Company"), which began operating in 2003. The record does not contain any of its governing documents. Initially, the Company consisted of three members: Plaintiff, Defendant, and Defendant's brother David George, each owning a one-third share. At all relevant times, Defendant was <u>a</u> managing member of the Company, although the Court cannot determine if he was the <u>sole</u> managing member. David George left the company in 2007. Thereafter, Plaintiff

and Defendant apparently each maintained a one-half interest in the Company. This is inferred as the record contains no documentation addressing the details of David George's departure and/or any consequent change in the Company's governing or corporate structure.

The Company primarily engaged in real estate transactions, obtaining properties either to sell or to own and manage as rentals. The Company itself did not normally either hold legal title to these properties or itself obtain the mortgages on these properties. Instead Plaintiff and Defendant either individually or through designated third parties acting at their direction actually purchased and took title to and mortgaged what were considered the Company's properties. Sometimes, and somewhat rarely, the parties would also add the Company's name or another individual's name to the title. However, as per Plaintiff's own credible testimony, the parties treated property held in the name of themselves or others acting at their direction as property of the Company. Similarly, the debts incurred in connection with the ownership of all real estate relevant to this proceeding, and thus involving Company property, were incurred by and in the name of the parties or some other individual, not necessarily the Company itself. Apparently the decision as to which person would purchase, take title to, or incur the mortgages or other debts, depended largely on the credit-worthiness of whomever could obtain the most favorable terms.

When a title-holding individual sold what was considered Company property, the proceeds (plus rental receipts) usually were funneled back into the Company itself. Those monies were used for operating and property-maintenance expenses connected with Company property. The parties testified to their verbal agreement to share equally in the Company's profits. As noted, the record does not contain any paperwork reflecting this arrangement or any other documentation as to any details of the parties' financial arrangement. The record also is

3
11-06602-mlo    Doc 107    Filed 09/23/16    Entered 09/26/16 08:31:32    Page 3 of 13

devoid of details regarding the parties' regular business practices for paying corporate expenses or debts.

In sum, the parties' recordkeeping was poor if not shoddy, at best. It appears they simply put realized funds back or into the Company as needed to pay for operations and, whenever they desired to do so, they kept or took funds to pay themselves. It does appear that in practice the Defendant/Debtor took a greater hand in the Company's financial matters than did Plaintiff. However, Plaintiff was an authorized signer on Company accounts and had the authority to conduct business on the Company's behalf, with or without Defendant's involvement. Based on the foregoing and lacking credible evidence to the contrary, the Court concludes that the parties had no formal process for managing the Company's finances and that either party could authorize payment of bills, incur debts, make or take distributions, and take other relevant financial actions on the Company's behalf.

In his capacity as a managing member of the Company, Defendant caused the preparation and filing of the Company's tax documents and returns at all times relevant to this proceeding. This included preparing a K-1 for the 2007 tax year which stated he was the Company's 100% owner. Defendant did not inform Plaintiff that he was claiming 100% ownership on the K-1 or show Plaintiff that document. Plaintiff only learned of that assertion on the K-1 long after Defendant had prepared and filed the document. Plaintiff has some concern about that matter lest is operate against him in this proceeding. However, the Court does not consider Plaintiff as being prejudiced by such in this action. A K-1 simply reflects compensation paid in order to track its tax consequences. It does not itself establish proof of corporate ownership interests. There is no evidence indicating that the Company's corporate structure was actually, legally, or otherwise factually changed to reflect Defendant as the 100% owner. Thus, at all relevant times

and for this Court's purposes, Plaintiff remained a legal member of the Company retaining whatever ownership percentage he had before Defendant drafted the K-1 (presumably a 50% ownership interest). There follow a number of transactions essentially comprising Plaintiff's claim(s) of debts, which he claims are non-dischargeable.

**(2)** **Facts Related to the Conant Property**

As is noted, the Company's primary business was real estate purchase, sale, and management in the manner indicated. In one such instance, in October 2006, Plaintiff and his wife deeded to Defendant two parcels of property located on Conant Street in Hamtramck, Michigan ("Conant Property") and titled in their names. Defendant then deeded the Conant Property to his wife who personally obtained a mortgage on it. The parties used the mortgage proceeds for expenses of the Company's operation, Defendant's wife of course being personally liable on the mortgage. The evidence also reflects that at relevant times the Conant Property had a tenant who initially paid rent directly to the Company. However, toward the end of the parties' business relationship Defendant directed that these rents be paid to another entity in which he had an interest.

Unfortunately, the Court cannot determine when the rental tenancy began or for how long it lasted. While there is no documentation reflecting the actual amount of rent owing or paid, the parties' testimony suggests the amount was somewhere between $2,5000.00—$2,800.00 per month. Plaintiff conceded he did not know the expenses associated with the Conant Property (i.e. mortgage, tax, maintenance, or insurance costs). Defendant testified the rent received on the Conant Property barely balanced the expenses associated with it—i.e. it essentially was a wash. Having before it no credible evidence to the contrary, the Court concludes that (a) at best the Conant Property yielded a negligible profit; and (b) this property was transferred as part of the

parties' normal business activities and did not itself either create or evidence any specific calculable debt Defendant owed to Plaintiff, let alone one that is not dischargeable.[1]

**(3)     Facts Related to the 2008 Properties**

In the fall of 2008, Plaintiff transferred a number of properties to Defendant's wife (the "2008 Properties"). It is unclear what specific properties were included in these transfers as Plaintiff did not present credible evidence necessary to make that determination. Regardless, Defendant concedes that Plaintiff did transfer some other properties to Defendant's wife in 2008. As occurred in the case of the Conant Property, Defendant's wife then obtained mortgages on those properties. One mortgage was a single first mortgage in the amount of $213,000.00, encumbering four properties. The second was also a single first mortgage in the amount of $204,750.00 encumbering five other properties. Altogether the two mortgages together encumbered nine properties thus creating a total initial mortgage debt of $417,750.00.

Plaintiff alleges that these mortgages were obtained for the purpose of paying him back a debt of $271,000.00 Defendant personally owed him. Plaintiff presented no documentary or other credible evidence reflecting (a) the existence of that alleged debt; (b) when that debt was incurred; (c) the circumstances surrounding its creation or its purpose; or (d) confirming his claim that any or which of the mortgage proceeds on the 2008 Properties were earmarked to repay that debt. Finally, Plaintiff conceded while testifying that there was no agreement as to exactly how some, any, or all of the mortgage proceeds were to be used. Apparently, some of those mortgage proceeds were in fact held back and eventually used by Defendant or his wife to

---

[1] Due to tax delinquency the Defendant's wife eventually lost the Conant Property to the Wayne County Treasurer. After his business relationship with Plaintiff ended, Defendant redeemed the Conant Property. Plaintiff presented no evidence of any agreement or understanding between himself and Defendant governing Defendant's use of the property or his management of its value or proceeds post-redemption. He also presented no evidence of Defendant owing him an obligation regarding that property following the end of their business relationship or after the property's redemption. Accordingly, Defendant's post-redemption use and management of the Conant Property is not relevant to this proceeding.

pay the mortgage on their personal family home.  Defendant claimed the rest of the proceeds were used to cover Company expenses and pay debts he and Plaintiff jointly owed to Citizens First Bank.  However, he offered no documentation confirming that and Plaintiff did not offer evidence contradicting it.  Additionally, it is to be noted again Defendant's wife, not Defendant, was and remained liable on these mortgages after the Company ceased operating.

At some point during their dealings, without Defendant's knowledge or consent Plaintiff made an audio recording of a conversation he had with Defendant.  At one point in the recording, a transcript of which is in evidence, Defendant appears to concede owing some amount to Plaintiff, but Defendant vehemently disputes the amounts to which Plaintiff claims he is entitled.  Additionally, at another point during the conversation Plaintiff conceded that he actually owed money to Defendant.  What is clear, however, based on the totality and weight of the evidence, is that Plaintiff offered no credible evidence supporting the various amounts discussed during this conversation.  He also offered no evidence indicating the nature of the debts discussed therein or when they arose.  Furthermore, at trial Defendant testified that he did not owe Plaintiff at the time, saying he only conceded a debt during the conversation because Plaintiff was "stalking" him.  Regardless, the Court cannot draw any useful conclusions from its convoluted contents.  The Court concludes Plaintiff has not proved the existence of any debt(s) arising from the transfer of or otherwise related to the 2008 Properties, let alone facts relating to the dischargeability of any such debt(s).

**(4)** **Facts Related to an Alleged $20,000 Debt**

Plaintiff also claims he loaned $20,000.00 to Defendant, but Plaintiff could not recall when he made the loan or any other details surrounding it, including repayment terms.  Plaintiff did not obtain a note for the alleged loan nor was there any other written or other evidence of

same from which the Court might properly infer its existence. As such, the Court does not find that such a debt was proved.

**(5)** **<u>Facts Relating to RYJ</u>**

Conflict also arose between the parties regarding their activities related to an investment in an entity known as RYJ, Inc. ("RYJ"). In 2007, Plaintiff was approached about investing in RYJ. Those representing RYJ offered Plaintiff a 20% interest, but stated that they did not want Defendant involved. Plaintiff did purchase a 20% interest in RYJ. Subsequently Defendant, separately and directly, approached one of RYJ's principals to discuss investing. Apparently RYJ's principals softened on their position regarding Defendant's involvement as they granted his request to invest in RYJ. The vehicle for Defendant's investment would be his purchase of half of Plaintiff's aforementioned 20% interest. To facilitate this, Defendant caused to be deposited a total of $125,000.00 into an RYJ account as payment for half of Plaintiff's interest. That payment was by way of checks from the account of D&A Companies, LLC, a separate entity that Defendant's wife owned.

Defendant then caused to be prepared a draft of a stock purchase agreement setting forth his acquisition of half of Plaintiff's interest in RYJ, which Plaintiff refused to sign. State court litigation ensued, with Defendant suing both RYJ and Plaintiff alleging his right to a 10% ownership interest in RYJ. The referred to previous state court proceeding was ordered to arbitration but Defendant filed for bankruptcy, staying the proceeding, before an arbitration award could be entered. Subsequent to the parties' conflict regarding RYJ, they received $127,500.00 in return on an investment they made in something called Sav-A-Lot. Plaintiff concedes he received this amount and the evidence indicates that Plaintiff received this amount, using and designating it as an offset for the value of Plaintiff's interest in RYJ. The Court finds

that this $127,500.00 payment erased any debt that might otherwise have existed regarding the parties' dispute over RYJ and, therefore, Defendant owes Plaintiff no debt regarding the referred-to RYJ investment.

**(6)** **Facts Related to the Kier Road and Beech Daly Properties**

Plaintiff also raises questions regarding the disposition of some properties located on Kier Road in Holly, Michigan and Beech Daly Road in Redford, Michigan. Plaintiff noted in his Proposed Findings of Fact and Conclusion of Law that Defendant did not disclose the Beech Daly property on his bankruptcy schedules. Plaintiff presented no credible evidence indicating that any activities or transactions involving the Beech Daly property created or otherwise were part of any debt Defendant owed to him. The same is true regarding any alleged debt relating to activities regarding or involving the Kier Road property. Neither Plaintiff's complaint nor the parties' Pretrial Stipulation references the properties and the Court concludes there is insufficient evidence to find the existence of any specific debt(s) relating thereto.

**(7)** **Miscellaneous Other Findings of Fact**

Plaintiff submitted only one document purporting to contain details about the amounts he claims Defendant owed him. That was Exhibit H, which is a single handwritten sheet of paper containing numerous dollar amounts. This Exhibit was apparently a writing prepared by Plaintiff and possibly added to at various points in time, appearing on its face to be an aggregation or summary of information either gleaned from his memory or other unadmitted and unavailable documents. This Exhibit has no detail whatsoever regarding the debts to which it allegedly refers and the various numbers it contains are unexplained. This Exhibit also does not make clear when any of the debts referenced therein arose. It has no information regarding repayment terms and contains no indication of what occasioned the alleged debts.

What someone non-contemporaneously writes down for himself, after the fact and at different times, can hardly be considered sufficient credible proof of multiple occurrences or transactions, particularly debt balances, calculations, and accountings. This is especially true when those occurrences and transactions are not otherwise unsupported by documentary proof and/or credible oral evidence. According to Plaintiff, Exhibit H confirmed the amounts he was owed by Defendant. That is not so. Exhibit H presents random and disconnected notations which do not sufficiently aid this Court in determining whether, when, if, or which debt existed. The Court cannot conclude from Exhibit H and the other presented evidence that Plaintiff has sustained his burden of proof.

### (C)     DISCUSSION

#### (1)     Plaintiff's Request for an "Adverse Inference" and Other Evidentiary Concerns

Given the dearth of other evidence, Plaintiff argues that Defendant's failure to produce various discoverable documents requires the Court to draw an adverse inference that had they been produced they would have been detrimental to Defendant's case. Plaintiff bases this on his claim that Defendant engaged in spoliation of certain documents. Spoliation is the intentional destruction, alteration, or concealment of evidence. A court has broad discretion to craft proper sanctions for spoliation of evidence. *Adkins v. Wolever*, 692 F.3d 499, 503 (6th Cir. 2009). An adverse inference is only appropriate if the offending party knew the evidence at issue was relevant and acted with culpability regarding the evidence's loss or destruction. *Id.* at 504. Such has not been shown here.

Plaintiff also complains that certain requested documents were produced tardily, including some that Defendant presented at his deposition taken a month before trial. That only highlights Plaintiff's own tardiness in pursuing such. Regardless, the information Defendant

produced at the deposition was neither lost nor destroyed and Plaintiff had it in plenty of time to prepare for trial.

The Court does understand that at least one bank with which the parties did business is no longer operating. That is not Defendant's fault but a mutual problem. The Court also recognizes that at some relevant times in this litigation Defendant was representing himself, although he did have counsel at trial. While that *pro se* status at times during the discovery phase does not relieve him of his obligation to adhere to the applicable discovery rules, it is relevant to the effect(s) of his non-adherence. To begin with, the record does not reveal formal material efforts by Plaintiff to seek or obtain records, let alone if such records existed, or the responses thereto and any proceedings incident to them would form a reasonable basis for the claim that Defendant destroyed, altered, mutilated, or concealed relevant records. The absence of such in and of itself is fatal to Plaintiff's claim in this regard.

Regardless, however, those claims and the other claims of stonewalling are not credibly substantiated or sufficiently specific to support an adverse inference as to the existence of any claimed debt or such debt's dischargeability. Additionally, even if one could draw the requested adverse inference, it would be but one piece of evidence to be considered along with all the other evidence. As hereinafter noted, whether inclusive or exclusive of the requested inference, when properly viewed and weighed in this case the evidence requires the conclusion that Plaintiff failed to sustain his burden of proof regarding the existence of any specific debt(s).

**(2)** **<u>Conclusion as to the Existence of any Specific Debt(s)</u>**

Section 523 of the Bankruptcy Code excludes discharge of specified "debts" and Section 101(12) defines a "debt" as a liability on a claim. A claim means a right to payment or a right to an equitable remedy. 11 U.S.C. § 101(11). Application of Section 523 is predicated on the

existence of an enforceable obligation owing from the debtor to the creditor. It is axiomatic that if no such debt exists then the purported creditor is not truly a creditor and there is no debt regarding which the Court can determine its dischargeability. By reason of the foregoing, the Court has concluded that Plaintiff has not proven the existence of any specific debt owing from Defendant and for that reason alone the Court must deny his claims.

Addtionally, but not decisively, when two parties' corporate business relationship breaks up it is not uncommon for there to be claims and cross claims, the nature and extent of which might eventually lead to the determination that one party might owe the other a debt. Here, and to some unknown unproven extent,, the Court is dealing in a dischargeability setting with claims of debts that actually may have arisen, to the extent they exist at all, initially at least( and before all of the Company's dealings have been sorted out) in favor of the Company rather than to or between its members or shareholders..If perchance a debt of some kind had arisen, its dischargeability may initially be more a matter between the Defendant and the Company. According to Plaintiff, Defendant owes him money as a result of various business dealings in which the parties engaged. To the extent the money allegedly owed involves Defendant's alleged misuse of Company property or funds,. such claims may be property of the Company in the first instance more properly pursued by it for the benefit of its creditors who may also include other than members or shareholders. . If Defendant abused his corporate position the injury initially flows to the Company and Plaintiff might have a derivative claim. As such, and to that extent, this particular type of litigation would not necessarily be the proper vehicle for what Plaintiff seeks.

**(D)** **CONCLUSION**

The Plaintiff asks this Court to except from discharge debts he claims Defendant owes to him. He bases that request on sections 523(a)(2)(A) and 523(a)(4) of the Bankruptcy Code, alleging that Defendant engaged in: false pretenses; fraudulent misrepresentation; actual fraud; breach of fiduciary duty; larceny; and embezzlement. As a party seeking nondischargeability under section 523(a), Plaintiff bore the burden of proving his allegations by a preponderance of the evidence and he did not meet that burden. Specifically, the Plaintiff has not proven by a preponderance of the evidence the existence of the claimed enforcible debts owing from Defendant to Plaintiff.. While therefore the Court need not, and does not, specifically opine on the alleged grounds of non-dischargeability of any such debts,, the Court in passing would note that its inability to conclude the facts and record support the existence of specific debts would likely adversely affect its ability to conclude that any such debts were non-dischargeable. Consistent with the foregoing the Court is contemporaneously entering an appropriate order.

_____

**Signed on September 23, 2016**

        **/s/ Walter Shapero**
**Walter Shapero**
**United States Bankruptcy Judge**